UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>DIEGO ANDERSON,<br><br>　　　　Defendant. | Case No: CR 11-0938 SBA<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**<br><br>Dkt. 15 |

Defendant Diego Anderson is charged in a one-count Indictment with a violation of 18 U.S.C. § 922(g)(1)—Felon in Possession of a Firearm. The parties are presently before the Court on Defendant's Motion to Suppress. Dkt. 15. Defendant seeks to suppress all evidence seized from him at the time of his arrest on November 8, 2011. Having read and considered the papers filed in connection with this matter, as well as the testimony presented at the evidentiary hearing, the Court hereby DENIES the motion for the reasons stated at the hearing and as set forth below.

I.   **BACKGROUND**

On November 8, 2011, law enforcement authorities in Contra Costa County received a 911 call from an unidentified female caller.[1] The caller informed the dispatcher that a man who had "pulled a gun out on [her] and [her] grandson" the prior week was washing a

---

[1] The Government produced a copy of the 911 recording, which the Court reviewed at the evidentiary hearing.

car at a location to the left of her house at 41 Market Avenue, Richmond, California. She described the individual as a black male named "Diego" who was in his late forties or early fifties, wearing all black. The caller requested anonymity "because they sell drugs." 41 Market Avenue, as well as the unit to the left, 31 Market Avenue, is part of public housing projects that cover an eight block area. Coniglio Decl. ¶¶ 4, Dkt. 16-1. That neighborhood is known to be a high crime area where members of North Richmond gangs congregate and drug dealing and shootings have occurred. Topete Decl. ¶ 5, Dkt. 16-2; Coniglio Decl. ¶¶ 4-5, Dkt. 16-1.

Shortly before 5:30 p.m., Contra Costa County Deputy Sheriff Anthony Coniglio responded to the radio dispatch call which conveyed the information summarized above. Coniglio Decl. ¶ 7. Upon his arrival at 31 Market, Deputy Coniglio observed a black male, later identified as the Defendant, wearing black clothing and washing a sport utility vehicle ("SUV"). Id. ¶ 8. Deputy Coniglio, who was in uniform, pulled his marked patrol car perpendicular to the SUV. Id. ¶ 9. Deputy Coniglio testified that he exited his vehicle and asked Defendant if he could speak with him. Defendant stopped washing his SUV, began acting nervously and immediately moved from the front of the SUV to the back corner, out of the deputy's line of sight. Defendant continued to move away from the deputy as he approached Defendant, using the SUV to block the deputy's view of him. Given Defendant's nervous and evasive behavior, the fact that he was alone and in a high crime area, and concerned that Defendant might be armed and using the SUV as cover, Deputy Coniglio pulled her service weapon, pointed it at Defendant and asked him to show his hands.

Defendant did not comply with the deputy's commands, and became agitated and continued to circle behind the car. Id. He then yelled, "That bitch called on me. We don't get along." Id. Deputy Coniglio told Defendant to calm down that all he wanted to do was to search him to make sure that he did not have any weapons. Id. Defendant nonetheless became more agitated and began to make his way from the back of the SUV to the front door of 31 Market Avenue, where three other men had congregated. Id. ¶ 11. As

Defendant attempted to enter the residence, the deputy tried to grab him by his arms, which were slippery from the soapy water presumably used to wash the car. Id. Defendant repeatedly told Deputy Coniglio that he had to go "piss" and that he would be "right back." Id. Based on his experience, Deputy Coniglio considered this to be a ploy by Defendant to escape through the bathroom window and/or to discard illegal contraband. Id.

Deputy Sheriff Jesus Topete then arrived on scene, apparently in response to the same dispatch call received by Deputy Coniglio. Topete Decl. ¶ 6. He observed Defendant attempting to flee from Deputy Coniglio. Id. ¶ 7. Concerned that Defendant might abscond, Deputy Topete remained in his patrol car in case he needed to chase Defendant. Id. However, Defendant appeared to calm down and ceased trying to escape from Deputy Coniglio. Id. At that point, Defendant raised his hands and allegedly said, "Alright, I have a gun in my pants, but there's no bullets." Coniglio Decl. ¶ 12.[2] Deputy Coniglio placed Defendant in handcuffs behind his back and found a semi-automatic firearm concealed on the right side of his waistband. Id. The firearm was unloaded and there was no magazine. Id. The time from when Deputy Coniglio first encountered Defendant until the recovery of the firearm was approximately eight minutes. Id. Deputy Coniglio read Defendant his Miranda rights and transported him to the County detention facility in Martinez, California. Id. ¶ 13.

On December 15, 2011, the Government filed an Indictment against Defendant charging him with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). Defendant has now filed a motion to suppress all evidence obtained "as a result of the unlawful stop, including the gun and [Defendant]'s alleged statements[.]" Def.'s Mot. at 3, Dkt. 15.

The Court conducted an evidentiary hearing in connection with the motion on June 14, 2012. Assistant United States Attorney Christina McCall appeared on behalf of the Government, and Assistant Federal Public Defender Jerome Matthews appeared on behalf

---

[2] Deputy Topete's declaration states that Defendant "raised his hands and said something about a gun." Topete Decl. ¶ 9.

of Defendant, who was present during the proceedings.  At the hearing, Deputies Coniglio and Topete testified as to the events occurring on November 8, 2011, regarding their contact with Defendant.[3]  Following the hearing, the parties submitted supplemental memoranda in support of their respective positions.  Dkt. 26, 27.

## II.   LEGAL STANDARD

The Fourth Amendment protects individuals against unreasonable searches and seizures.  U.S. Const. amend. IV. Any evidence resulting from an unconstitutional search or seizure cannot be admitted as proof against the victim of the search, and therefore must be suppressed.  See Wong Sun v. United States, 371 U.S. 471, 485 (1963).  In general, a warrant is required to search a person unless a warrantless search is objectively reasonable under the circumstances presented.  See United States v. Snipe, 515 F.3d 947, 950 (9th Cir. 2008).  Where a warrantless search is involved, the Government bears the burden of demonstrating that a warrant requirement is inapplicable.  See United States v. Hawkins, 249 F.3d 867, 872 (9th Cir. 2001).

## III.   DISCUSSION

### A.   REASONABLE SUSPICION

Under the Fourth Amendment, an investigative detention is permissible if it is based upon specific articulable facts which justify suspicion that the detained person is, has been, or is about to be engaged in criminal activity.  Terry v. Ohio, 392 U.S. 1, 26 (1968).  The quantity and quality of information necessary to create reasonable suspicion for a Terry stop is less than that necessary to establish probable cause.  Alabama v. White, 496 U.S. 325, 330 (1990).  "In deciding whether a stop was supported by reasonable suspicion, the court must consider whether in light of the totality of the circumstances, the officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity."  United States v. Basher, 629 F.2d 1161, 1165 (9th Cir. 2011) (internal quotation marks omitted).

---

[3] The Court finds that both of these witnesses were credible with respect to the testimony provided at the hearing.

"In order to determine if reasonable suspicion existed to justify an investigatory stop, the court must consider the facts available to the officer at the moment of seizure." United States v. Smith, 217 F.3d 746, 750 (9th Cir. 2000) (citing Terry, 392 U.S. at 22). In that regard, a suspect's furtive gestures or police avoidance behavior is relevant to a Terry reasonable suspicion analysis. See Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); United States v. Palos v. Marquez, 591 F.3d 1272, 1278 (9th Cir. 2010) (agents' observation that passengers appeared "nervous and shaky" was "another relevant consideration in the reasonable suspicion equation."). The location in which the suspect's activity occurred also may be germane. See United States v. Smith, 633 F.3d 889, 893 (9th Cir. 2011) (holding that "officers may take into account the context in which suspicious activity occurs 'in determining whether the circumstances are sufficiently suspicious to warrant further investigation.'") (quoting Wardlaw, 528 U.S. at 124). In addition, an officer's training and experience may be considered in assessing reasonable suspicion. See Ramirez v. City of Buena Park, 560 F.3d 1012, 1020-21 (9th Cir. 2009).

Here, there is ample support for the Government's contention that the detention of Defendant was lawful. At the evidentiary hearing, Deputy Coniglio testified that on November 8, 2011, he received a dispatch that a caller had reported that an African-American male wearing all black who had pulled a gun on her and her grandson the prior week was washing his vehicle at 41 Market Street, which was next to the caller's house. The week before, Deputy Coniglio had responded to a dispatch to the same address from the same caller who had reported that someone had pulled a gun on her. Deputy Coniglio testified that upon receiving the dispatch, he recalled the call from the week before and concluded that the calls were related and that the same perpetrator was involved and potentially armed.

When Deputy Coniglio arrived at 41 Market Street, he observed an African-American male washing his car in black attire, as described by the caller. He approached Defendant and asked to speak to him. Defendant responded by furtively moving away

from the deputy, and positioning himself so as to conceal himself behind the SUV. At this point, Deputy Coniglio became concerned for his personal safety since it was dark and he was in a high crime area known for gang activity, coupled with his belief that the person he was confronting was likely the same person who had previously been reported as having pulled a gun on another person. In addition, Deputy Coniglio was concerned because he could not see Defendant's hands (due to Defendant having positioned himself behind the SUV), that he may have been in the process of pulling a gun on the deputy. Although the deputy could have retreated, he feared that, under the circumstances presented, doing so might place him in more danger since he was alone and without backup. Consequently, the Deputy drew his firearm and pointed it at Defendant. In response, Defendant blurted out words to the effect of "that bitch called on me…. we don't get along," thereby tacitly admitting that he was the same person that had pulled a gun on the caller the week earlier and was the same person she was calling about on this particular occasion. Defendant then attempted to make his way to the entrance of 41 Market Street. All of these facts, taken together, support the conclusion that Deputy Coniglio had a particularized and objective basis for conducting an investigatory stop of Defendant.[4]

### B. FLORIDA V. J.L.

Relying on Florida v. J.L., 529 U.S. 266 (2000), Defendant contends that the tip from the 911 caller was insufficient to provide Deputy Coniglio with reasonable suspicion, ostensibly because the call was "anonymous" and did not provide any predictive information or information that criminal activity was afoot. Def.'s Reply at 4; Def.'s Supp.

---

[4] Defendant asserts that he was seized as soon as Deputy Coniglio pointed his service weapon at him, and therefore, all of his subsequent actions—such as his inculpatory utterance and attempted flight—cannot be considered for purposes of assessing reasonable suspicion. The Supreme Court has held that a seizure does not occur where the subject does not yield to a show of authority. California v. Hodari D., 499 U.S. 621, 626 (1991). Here, the record shows that Defendant continued to evade Deputy Coniglio, even after he drew his weapon. As such, there was no seizure at that juncture. See Smith, 633 F.3d at 893 (holding that the defendant was not seized when he initially hesitated and engaged in a short verbal exchange with the officer but then fled). But even if Defendant were seized at that point, Deputy Coniglio already possessed more than sufficient information available to him to support a finding of reasonable suspicion.

1  Mem. at 5.  In J.L., an anonymous caller told police that a young African-American male
2  who was standing at a particular bus stop and wearing a plaid shirt was carrying a gun.
3  Within minutes, an officer saw three African-American males at the bus stop, one of whom
4  was wearing a plaid shirt.  The police frisked all three and found a gun on the male wearing
5  the plaid shirt.  The Supreme Court held that the anonymous caller's tip lacked sufficient
6  indicia of reliability to support the stop and frisk and upheld the suppression of evidence.
7  Id. at 270-271.
8      In reaching its decision, the Court contrasted its prior decision in Alabama v. White,
9  496 U.S. 325 (1990), where an anonymous tipster informed the police that a woman was
10 carrying cocaine and predicted that she would leave an apartment building at a specified
11 time, get into a car matching a particular description, and drive to a named motel.  Id. at
12 329.  Although the tip alone would not have justified a Terry stop, the Court found that the
13 police officers gained the necessary reasonable suspicion after their observations
14 corroborated the tipster's predictions regarding the woman's movements.  Id. at 332.  In
15 J.L., however, "[t]he anonymous call concerning J.L. provided no predictive information
16 and therefore left the police without means to test the informant's knowledge or
17 credibility."  J.L., 529 U.S. at 271.  Rather, all the police had to rely upon was the bare
18 report of an unknown, unaccountable informant who neither explained how he knew about
19 the gun nor supplied any basis for believing he had inside information about J.L.  Id.  The
20 fact that the tipster accurately described the suspect's physical attributes was inapt, since it
21 "did not show that the tipster ha[d] knowledge of concealed criminal activity."  Id. at 272.
22     The instant case is fundamentally different than J.L. and White.  As an initial matter,
23 the caller in this action was not anonymous.  Though she did not provide her name, the
24 caller, whose voice is readily identifiable as a female, disclosed where she lived and that
25 she had a grandson.  Indeed, Deputy Coniglio testified that the caller was the same person
26 who had called the police the week earlier.  A tipster is not "anonymous" if the information
27 provided by him or her is sufficient to narrow the likely class of informants such that the
28 tipster could be held accountable for any fabrications.  See United States v. Terry-Crespo,

356 F.3d 1170, 1174 (9th Cir. 2004) ("Even though the arresting officer neither had the employee's name in advance of the Terry stop nor had corroborated any illegal activity prior to the stop, . . . [w]e did not treat the informant as anonymous because the tip narrowed the likely class of informants to Montana Department of Transportation employees.") (citing United States v. Fernandez-Castillo, 324 F.3d 1114 (9th Cir. 2003)). Because the caller could easily be identified and held accountable for fabricating any story, the concerns raised by anonymous tips are simply not present. Id.

Nor is the Court persuaded by Defendant's argument that Deputy Coniglio had no basis to stop him on the grounds that the caller did not provide any predictive information regarding future activity. See Def.'s Supp. Mem. at 6. J.L. does not hold that the corroboration of predictive information is the *only* manner in which to evaluate whether a tip is sufficient to provide reasonable suspicion. See United States v. Wheat, 278 F.3d 722, 734 (8th Cir. 2001) (noting that "White did not create a rule requiring that a tip predict future action, and neither did J.L.") (citation and emphasis omitted). To the contrary, the Supreme Court has explained that the reliability of an informant's information depends on the particular circumstances involved. See Adams v. Williams, 407 U.S. 143, 147 (1972) (noting that a Terry stop may be appropriate "when victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime."). Here, the tip at issue was not that Defendant was about to commit a crime; rather, it was that Defendant had committed a crime against the tipster herself.[5]  As such, the deputy had a right to conduct a Terry stop to investigate the accusation made by the caller. See Gallegos v. City of Los Angeles, 308 F.3d 987, 991 (9th Cir. 2002) ("The whole point of an investigatory stop, as the name suggests, is to allow police to investigate, in this case to make sure that they have the right person; see also Adams, 407 U.S. at 145 (1972) ("A brief stop of a suspicious individual, in order to

---

[5] This further distinguishes the instant case from J.L., where the tipster did not provide any information to establish how he knew that the suspect was carrying a gun. In this case, the caller revealed that Defendant had pointed a gun at her and her grandson the previous week.

determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.").

Defendant argues that when Deputy Coniglio approached, he was merely washing his vehicle, which is not inherently suspicious behavior. But Defendant ignores that Deputy Coniglio had just received a dispatch call about a person matching Defendant's description who allegedly had pulled a gun on the caller and her grandson—and the fact that he had received a similar call the week earlier from the same person. In addition, once Deputy Coniglio attempted to engage Defendant, he became nervous and evasive. As discussed, in response to Deputy Coniglio's efforts to contact him, Defendant furtively moved to the back of the SUV to place himself out of Deputy Coniglio's line of sight. Defendant's actions caused Deputy Coniglio to fear for his safety and prompted him to draw his weapon.

Defendant attempts to downplay the significance of his nervous behavior and suggests that it was a natural response to an encounter with a law enforcement officer. Nevertheless, that does not obviate the fact that this behavior and other facts and circumstances beyond the information contained in the tip were sufficient to support a finding that Deputy Coniglio had reasonable cause to detain Defendant. See id., 633 F.3d at 894 (finding reasonable suspicion where it was "undisputed that [defendant] Smith was in a high-crime neighborhood during the events in question, that Officer Dominguez clearly identified himself as a police officer, and that Smith burst into headlong flight for no other reason than to evade Officer Dominguez."); United States v. Perkins, 363 F.3d 317, 324 (4th Cir. 2004) ("And here the tip was not the sole basis for the Terry stop, as Officer Burdette confirmed the tip's reliability with his own knowledge of the area and with his own observations upon arriving at the scene.").

//
//
//
//

IV. **CONCLUSION**

For the reasons stated above,

IT IS HEREBY ORDERED THAT Defendant's motion to suppress is DENIED. This matter is referred to the duty magistrate judge for status/trial setting. This Order terminates Docket 15.

IT IS SO ORDERED.

Dated: August 10, 2012

_Saundra B. Armstrong_
SAUNDRA BROWN ARMSTRONG
United States District Judge